IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>    Plaintiff, )<br> )<br>v. )<br> )<br>BEN BAKER, )<br>    Defendant. ) | No. 18 CR 216<br><br>Honorable Charles R. Norgle |

## BEN BAKER'S SENTENCING MEMORANDUM

Defendant Ben Baker, by and through his undersigned counsel, submits this sentencing memorandum setting forth certain factors to be considered in determining a sentence that is sufficient but not greater than necessary under 18 U.S.C. § 3553(a). Mr. Baker seeks a below-guidelines sentence of probation, which would comply with and exalt the directives of 18 U.S.C. § 3553(a). As discussed below, Mr. Baker's is an extraordinary case. His demonstrated courage and resilience, contributions to the rule of law, commitment to family, strong work ethic, nature and circumstances of the offense, and his exemplary performance on pretrial release, all require a substantially below-guidelines sentence of probation.

**I.    LEGAL STANDARDS**

A sentence must be "sufficient, but not greater than necessary" to satisfy the purposes of sentencing. 18 U.S.C. § 3553(a). The statutory sentencing factors found in section 3553(a) provide the Court with the framework upon which to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing by taking into account, among other things, the nature and circumstances of the offense, the history and characteristics of the defendant,

and the need for the sentence imposed to satisfy the purposes of sentencing. *Id.* Courts are required "to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.'" *Pepper v. United States*, 131 S. Ct. 1229, 1240 (2011) (internal quotations omitted).

## II. GUIDELINES

Mr. Baker concurs that the Guidelines suggest a 21 to 27 month period of imprisonment. PSR, ¶ 91.

## III. PSR

After refusing to be extorted by a gang of corrupt Chicago Police Department Officers operating out of the Ida B. Wells housing projects, Ben was repeatedly framed and wrongfully prosecuted. He was granted a certificate of innocence as to both offenses. PSR, ¶¶ 52, 53; *People v. Glenn*, 106 N.E.3d 462, 464 (Ill. App. Ct. 2018). Such certificates are awarded after a finding of actual innocence. Thus, it's important to understand that while the PSR quotes from narrative police reports as an assessment of what transpired, those accounts were found to be wholly false by a court of law. Thus, we ask that the narrative portion of PSR paragraphs 52 and 53—recounting the false statements of law enforcement—be stricken from the report.

## IV. 3553(A) FACTORS

### A. History and Characteristics

#### 1. *Family*

Ben Benny Benard Baker was born in Chicago and spent much of his childhood at his grandmother's home in the Ida B. Wells housing projects. PSR,

¶ 55, 58.  Ben comes from a large extended family in Chicago and Milwaukee. When his grandmother died in the mid-1980s, Ben's happy upbringing took a sudden shift.  His mother started abusing heroin and cocaine and was eventually incarcerated for theft.  PSR, ¶ 59.  Ben was sent to Milwaukee to get away from home and life around the projects.  PSR, ¶ 58.

He returned to Chicago in 1990 and met Clarissa Glenn, the love his life, soon after.  PSR, ¶¶ 60-62.  Much has been written about Ben and Clarissa's story, including an authoritative article in the New Yorker about Clarissa (and Ben's) public battle to fight a corrupt crew of police officers and to finally win exoneration.  *See* Jennifer Gonnerman, *How One Woman's Fight to Save Her Family Helped Lead to a Mass Exoneration*, NEW YORKER, May 28, 2018 (Exhibit Q).[1]  Clarissa is the mother of their three children: Ben Jr., Gerard, and Deon. PSR, ¶¶ 60, 62.  Together, they raised their three sons in Ida B. Welles.  *Id.*

Ben also has an older daughter, and is a proud grandfather to her children. PSR, ¶ 63.  His fourth son suffered from a genetic disorder and a tragic birth that left him unable to communicate; he requires a feeding tube.  PSR, ¶ 64.  Ben has always maintained a strong relationship with all of his children.  *See* PSR, ¶¶ 62-64.  Until he was framed and incarcerated, Ben was the primary caretaker for their three sons while Clarissa worked a 9 to 5 job.

Ben and Clarissa formally married in 2006.  PSR, ¶ 60.  They stayed together for many years, but eventually prison proved too much of a barrier. Clarissa divorced him in 2014.  PSR, ¶ 60.  They reconciled within days of Ben's

---

[1] https://www.newyorker.com/magazine/2018/05/28/how-one-womans-fight-to-save-her-family-helped-lead-to-a-mass-exoneration

3

release in January 2016. Exhibit Q (NEW YORKER), at 18-19. Together, they live as a family in a long-term rental in a stable community. PSR, ¶ 65.

A theme echoed throughout the letters is how Ben "is the glue" that holds everyone together. Carol Baker Letter (Exhibit H). *See also* Denisia Bell Letter ("[H]e is the male backbone of the family.") (Exhibit I); Jasmine Cheers Letter ("He is the one who keeps the family together.") (Exhibit L). When Ben was wrongfully imprisoned and taken away from his family for almost ten years, everyone suffered. *See, e.g.*, Gale Miller Anderson Letter (Exhibit J). Ben came out of prison determined to bring his family back together.

The support Ben provides the younger generation is concrete and unconditional. Numerous cousins and nieces and nephews explain how Ben is consistently there for them. He encourages positive, healthy goals and supporting them through difficult times. *See* Carol Baker Letter (Ben "has inspired the majority of our family members to go back to school for their certifications or degrees."); Clarence Glenn Letter (Exhibit E); Marva Baker Letter (Exhibit K); Lamonica Lee Letter (Exhibit G). Lamonica Lee, Ben's niece, talks about how Ben immediately stepped up as a father figure to her two children when their father was murdered. Exhibit G. And, as his aunt Marva Baker explains, "[h]e is an inspiration to his elders by motivating us to stay strong, and letting us know we are not alone." Exhibit K. From pep talks to family outings to helping with the day-to-day, Ben lovingly rebuilt a strong system of family support. It is without a doubt that his family will likewise support him as he walks into the future.

4

> 2. *Ben's Courage and Tenacity in Exposing Police Misconduct*

As discussed above, Ben Baker was framed by former CPD Sergeant Ronald Watts. Ronald Watts is a now notorious name. As well explained by the Illinois Court of Claims:

> Chicago Police Sergeant Ronald Watts and his team of police officers ran what can only be described as a criminal enterprise right out of the movie 'Training Day".
>
> Watts and his team regularly shook down drug dealers and other residents of the Ida B. Wells housing project. On many occasions when these residents refused to pay the extortive demands the Watts crew would fabricate drug charges against them.

Illinois Court of Claims Order, Dec. 13, 2018 (Exhibit O). *See generally* Jamie Kalven, *Code of Silence*, THE INTERCEPT, (detailing the corruption of Sgt. Watts and the Code of Silence which protected his crew).[2] To facilitate the false arrests that were used to uphold their power, Watts and his crew lied under oath for years and routinely fabricated police reports, such as those cited in PSR. *See* PSR, ¶¶ 52, 53.

Ben Baker had a history of "small time drug dealing," which would deter most from challenging the police, but Ben refused to be extorted. Exhibit O, at 3. Ben reported their actions to the Office of Professional Standards (OPS), the agency then governing Chicago Police Department accountability. *People v. Glenn*, 106 N.E.3d 462, 463 (Ill. App. Ct. 2018). For that, he became a target of Watts and his corrupt police gang. *See* Joshua Tepfer Letter (Exhibit B), at 2. Beginning in 2004, Watts and his officers repeatedly falsely arrested and framed Ben. *Id.* That did not silence him. In October 2005, he met with an Assistant

---

[2] https://theintercept.com/series/code-of-silence/

5

State's Attorney and explained what Watts had done to him and others. *See* CL Report of Oct. 17, 2005 Meeting (Exhibit P).

Watts's team falsely arrested Ben a final time in December 2005. This time, they also framed Clarissa. *Glenn*, 106 N.E.3d at 463. After a trial on one of the false cases, Ben was wrongfully convicted and sentenced to 18 years in prison. He cut a deal on the remaining case to shield Clarissa from prison. *Id.* at 463-64; Exhibit B, at 2.

Throughout multiple criminal proceedings, internal investigations, and post-conviction proceedings Ben consistently asserted that Ronald Watts had set him up. Watts was finally taken off the street in 2012 when he and his partner Kallatt Mohammad were prosecuted and convicted by the U.S. Attorney's Office for similar offenses. *United States v. Ronald Watts, et al.*, (N D. Ill. 12 CR 87).

That prosecution paved the way for Ben's exoneration. Finally vindicated, the Cook County State's Attorney dismissed his case and Ben was released from wrongful incarceration in January of 2016. *Glenn*, 106 N.E.3d at 464. He and Clarissa were granted certificates of innocence. *Id.*; PSR, ¶¶ 52, 53, 60. Ben was the very first Watts exoneree, and he helped swing open the floodgates. Exhibit B, at 3. As his attorney (and friend) Joshua Tepfer explained: "there is a direct and through line from Ben and Clarissa's willingness to speak truth publically to the fact that 62 other victims of these officers have received justice." *Id.* Ben's actions showed tremendous tenacity and courage.

Ben spent a decade fighting for the rule of law. He persisted through nine and half years of incarceration, finally winning his freedom. In doing so, Ben's fight was pivotal to exposing a criminal pattern of behavior. Yet, Ben's courage

6

was not without cost. His family paid bitterly for him speaking out. As payback, Clarissa was also framed and prosecuted. Their family was ripped apart. Marred by his record and long stint in prison, Ben struggled to find steady work.

Nevertheless, Ben and Clarissa continue to speak out and help to educate others about the way the system failed them. Even during pendency of this case, Ben continued to assist in the investigation of Ronald Watts and his cronies. In December of 2018, Ben was interviewed by the Civilian Office of Police Accountability (COPA). Ben and Clarissa have spoken to students and at public events about their story, in efforts to help educate others about the entrenched difficulty of uprooting police corruption. They both also "do motivational speaking to youth in different communities, teaching them the dangers of criminal lifestyles." Roger and Javette Baker Letter (Exhibit F).

Ben's tremendous strength of character is not anomalous; it is reflected in his commitment to self-betterment, his strong work ethic, and the unflagging support for his large family. *See generally* Exhibits A-L. This is also evident in the fact that he made the most of his time spent wrongfully incarcerated in the Illinois Department of Corrections. Ben obtained is GED, completed other classes and programming, and became a peer educator. PSR, ¶ 81; IDOC Letter, Feb. 2015 (Exhibit M); IDOC Certificate, Aug. 2013 (Exhibit N).

    3. *Struggles in Reentry*

Ben was exonerated and released in January of 2016. As with many, reentry was challenging. After almost a decade away, Ben struggled to find steady work to support his family. Clarissa Baker Letter (Exhibit A), at 1-2; Exhibit B, at 4; PSR, ¶¶ 9, 84.

7

Reentry is difficult. As practitioners in the criminal justice system, we know this first hand. Our district's James B. Moran Second Chance Reentry Court recognizes that former prisoners face very real struggles upon release. Ben Baker was not immune to these challenges. In fact, as Mr. Tepfer's letter indicates, there is no safety net for the innocent survivors of wrongful incarceration. Exhibit B, at 4. Nonetheless, Ben was not idle; he went to job fairs, filled out many applications, and followed up on any lead. Exhibit B, at 4. Clarissa was also struggling to work full time. Exhibit A, at 1. Their sons worked hard to support the family. Exhibit A, at 1-2; PSR, ¶ 9. As Clarissa writes in her letter, having "children taking the financial responsibility of the household is a very humbling experience." Exhibit A, at 1. Ben felt stressed to provide and contribute to the family's needs. It is within that context that Ben backslid. Very intermittently, from March to August 2017, Ben Baker sold small amounts of heroin to someone he knew. PSR, ¶ 10. In total he sold 34.7 grams. *Id*.

He and Clarissa received checks for their wrongful convictions in the summer of 2017. Letter B, at 4. Finally, in November 2017 he joined the team at ADE, Inc., a family-owned packaging manufacturer located on the South Side of Chicago. As is clear from the attached letters from President Jason Lofgren and Executive Vice President Megan Dunn, Ben is incredibly hard-working and indispensible. *See* Jason Lofgren Letters (Apr. 2018 & Jan. 2019) (Exhibit C); Megan Dunn Letter (Jan. 2019) (Exhibit D). He worked a full schedule every week, often overtime. Five months later, Ben was arrested on this case. PSR, ¶ 1.

### 4. Ben Baker's Hard Work

As the letters from Mr. Lofgren and Ms. Dunn make abundantly clear, Ben is an exceptional employee. *See* Exhibits C & D. Mr. Lofgren's first letter was written in April 2018, immediately after Ben's arrest in this case, in support of his pretrial release. Exhibit C, at 1. His second letter was written after Ben had worked with ADE Inc. for over a year. Exhibit C, at 2. As both letters show, from the moment he was hired, Ben hit the ground running as a machinist at this small packaging company. Mr. Lofgren explains that in an emergency situation, Ben worked alongside him, seventeen days in a row, for mostly twelve-hour shifts, with good cheer and skill. Exhibit C, at 1. Ben is an asset at work; Mr. Lofgren explains: "not only is Ben's work outstanding but his calm, well-mannered and intelligent disposition positively effects those he works with - making for a better environment for all." *Id.* at 2. Ms. Dunn describes Ben as a model worker, who is always willing to do whatever is asked of him. Exhibit D.

Always looking to expand his skills and opportunities, with the Court's permission he enrolled in Commercial Driving classes at Olive-Harvey College. Dkt. 53. After weeks of working all day and going to school at night, Ben made the decision to leave ADE to focus fulltime on his schooling. He completed his classes, passed all necessary testing, and obtained his CDL. With the goal to gain stable employment as long-haul semi-tractor driver in the trucking industry, Ben got a job offer from System Transport, a national trucking company. Dkt. 70-1, 70-2. He attended training in Cheney, Washington, was supervised over-the-road, and eventually given his own routes in the Midwest. Dkt. 70-2, 76-2. However, being away from his family for stretches of time was more difficult that

Ben had imagined. He decided to return to work at ADE, Inc. so that he could be closer to his family. In the near future, he hopes to find a more local driving route. In the longer-term future, Ben hopes to start a trucking company with some of his sons and family members. Exhibit A, at 2. Since overcoming early hiccups in re-entry, Ben has shown that he will work tirelessly to build a better life for himself and for his family.

>        5.        *Exceptional Behavior on Pretrial Release*

This drive to succeed is echoed in Ben's exceptional behavior while on bond. As the PSR indicates and this Court has observed, Ben Baker has been fully compliant with all conditions of bond since his initial arrest over eighteen months ago. PSR, ¶¶ 7, 11. As many of letters from his family indicate, from the moment he was exonerated and freed, Ben worked hard to stitch the family back together. This Court permitted him to continue on that pro-social trajectory by granting him movement to attend numerous family events. For instance, Ben was given leave to attend the funeral of his uncle John Lee Baker (Dkt. 33), a Thanksgiving gathering (Dkt. 44), various winter holiday events (Dkt. 47); the funeral of his aunt Vivian Baker (Dkt. 52); a baby shower and a birthday party (Dkt. 58); and, a family event in Milwaukee, Wisconsin (Dkt. 66).

After a demonstrated record of compliance, Ben's Pretrial Services Officer recommended that Ben be removed from electronic monitoring. Dkt. 70, at 1. This Court agreed and over the Government's objection, entrusted Ben to curfew—a trust that he has not violated. *See* Dkt. 73. Since his transition to curfew, Ben continues to work and see family regularly. He has taken this process seriously and has been open about his mistakes. *See* PSR, ¶¶ 9, 74.

10

In summary, Ben's courage and tenacity has bettered our system of justice and will continue to serve him well in his days to come. His resiliency helped him gain employment after repeated rejections and made him into an eager and hard worker. His love of family and deep caretaking of others helped reunite a fractured family. At 47 years old, Ben lost a decade of his life to wrongful convictions. As is clear from his hard work and compliance on pretrial release, Ben's past is not his future. Ben Baker's history and characteristics reveals that the instant offense is an aberration, not the norm.

### B. Nature and Circumstance of Offense

To be sure, selling heroin—no matter how little—is a serious offense. But, in our district, relative to most other drug offenses, Ben's offense is plainly among the least significant. He sold small amounts of heroin infrequently. Over a six month time period, Ben earned just a couple thousand dollars and sold less than 40 grams of heroin. PSR, at ¶ 10. (After his arrest he learned that some of the heroin was actually fentanyl and a fentanyl analogue.)

Ben has been forthcoming with his family and with the Court about what led to this case. PSR, ¶ 9. He struggled in reentry, and fell back to the skills he learned as small-time drug dealer. Most importantly, Ben self-corrected that course well before his arrest. Criminal prosecution was not needed to deter Ben. He finally found what we he had been seeking – a lawful job to support his family. From that moment forward, Ben never looked back. As explained above, Ben became a model employee, giving his time and energy with kindness and care. Ben has been honest with his family about his shortcomings. He expends extraordinary energy encouraging the younger generation of his family to stay on

the right path. Thus, the nature and circumstances of the offense must be analyzed within the context of Ben's immensely positive life trajectory.

### C. Deterrence

For all of the forgoing reasons, a prison sentence is surely not needed to deter Mr. Baker. Social science and empirical data regarding family support, age, and swiftness and surety of sanctions, also support that conclusion. Additionally, research shows that shame and social stigma—both present here—are more effective than actual punishment in uplifting the principle of general deterrence.

#### 1. *Family Support*

Familial support is an important predictor of an offender's success after incarceration because those relationships substantially reduce his risk of recidivism. Solangel Maldonado, *Recidivism and Parental Engagement*, 40 FAMILY L. Q. 191, 196 (2006). *See also* Mark T. Berg & Beth M. Huebner, *Reentry and the Ties that Bind: An Examination of Social Ties, Employment, and Recidivism*, 28 JUSTICE Q. 382, 384-86, 401-02 (2011). Offenders who maintain strong family networks, as Ben has mightily done, are less likely to recidivate.

#### 2. *Age and Recidivism*

Age plays a positive role in recidivism because "[r]ecidivism rates decline relatively consistently as age increases."[3] In fact, age at the time of a prisoner's

---

[3] U.S. SENTENCING COMM'N, MEASURING RECIDIVISM: THE CRIMINAL HISTORY COMPUTATION OF THE FEDERAL SENTENCING GUIDELINES 12 (2004) (hereinafter MEASURING RECIDIVISM).

12

release is the strongest predictor of leading a law-abiding life after release.[4] Mr. Baker is currently 47 years old. The U.S. Sentencing Commission reports that older offenders between the ages of 41 to 50 years of age recidivate at only a 12.7% rate— significantly less than younger offenders.[5] While Ben was in his forties at the time of the occurrence here, his trajectory after gaining employment shows that maturity took hold and he discontinued his wrongful decisions. This self-correction as well as empirical data on age and recidivism show that it is profoundly unlikely the system will ever see Mr. Baker again.

        3.     *Swiftness and Surety, Not Severity*

Moreover, decades of empirical research into evidence-based correctional practice reveal a uniformly accepted principle: swiftness and surety of sanctions have a greater deterrent effect than severity of punishment.[6] "The research evidence is unequivocal that incarceration does not reduce offender recidivism."[7] In the instant case, Ben veered from the right path for a short period of time before self-correcting. His involvement was neither extensive nor lengthy. But,

---

[4] *See* Kyung Yon Jhi & Hee-Jong Joo, *Predictors of recidivism across major age groups of parolees in Texas*, 6 JUST. POL'Y J. 1 (2009), at 7-9 (reviewing recidivism studies and discussing age and recidivism).

[5] *See* MEASURING RECIDIVISM, at 28.

[6] *E.g.* FAYE S. TAXMAN, ERIC S. SHEPARDSON & JAMES M. BYRNE, TOOLS OF THE TRADE: A GUIDE TO INCORPORATING SCIENCE INTO PRACTICE 62-63 (2004).

[7] ROGER WARREN, NAT'L CTR. FOR STATE COURTS, EVIDENCE-BASED PRACTICE TO REDUCE RECIDIVISM: IMPLICATIONS FOR STATE JUDICIARIES 14 (2007), http://nicic.gov/library/files/ 023358.pdf. *See also* Raymond Pasternoster, *How Much Do We Really Know About Criminal Deterrence*, 100 J. CRIM. L. & CRIMINOLOGY 765, 817-18 (2010) (discussing and reviewing studies on deterrence); Francis T. Cullen, Cheryl Lero Johnson & Daniel S. Nagin, *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 THE PRISON J. 48S, 50S-51S (2011).

13

nevertheless he stands before the Court for that conduct, clearly demonstrating that wrongful conduct will yield profound consequences. The surety of sanctions is pronounced in this case.

### 4. *General Deterrence*

As for general deterrence, it "occurs when the decision maker contemplates the punishment experiences of others."[8] Consequently, general deterrence "does not concern a 'connection' between behavior and consequences, but whether potential consequences already recognized by the decision maker seem sufficiently 'costly' to deter behavior." *Id.* Research shows that the "conforming influence" of extralegal consequences attendant indictment and prosecution—shame, fear of peer disapproval, embarrassment, and social stigma—to be far more effective than actual punishment in fostering general deterrence. *Id.* at 869. This is especially so for people like Ben Baker, who is an engaged member of a larger community and whose arrest was publically broadcast. *See, e.g.*, Exhibit Q, at 22-24 (NEW YORKER); Jason Meisner, *Two men framed by corrupt police sergeant Ronald Watts heroin face new charges of dealing heroin*, CHICAGO TRIBUNE, Apr. 11, 2018. The mere threat of carceral sanctions sufficiently deters most.

In summary, the severe penalty of incarceration is not necessary to achieve the goals of deterrence in Ben Baker's matter.

---

[8] Daniel S. Nagin & Greg Pogarsy, *Integrating Celerity, Impulsivity, an Extralegal Sanction Threats into a Model of General Deterrence*, 39(4) CRIMINOLOGY, 865, 867 (2001).

14

### D. Incapacitation

Moreover, there is no specific need to incapacitate Mr. Baker. His perfect conduct during pretrial release further demonstrates that the public need not be protected from him.

### E. Just Punishment

An incarceration sentence would not serve the interests of justice here. Ben carries a carceral deficit of nearly ten years—time unlawfully taken from him that he did not owe. His wrongful choices have been the subject of local news articles, and he has been publically shamed. Ultimately, Ben's failure to live up to the high expectations he sets for his own family will prove the greatest source of punishment. Ben is unquestionably on the right course, and re-imprisonment would profoundly set back that growth and development. He has been punished and he has been deterred.

### F. Rehabilitation

And, the Seventh Circuit recognizes that probation "can be a sufficiently serious sentence." *United States v. Warner*, 792 F.3d 847, 860 (7th Cir. 2015). While a "credible threat of imprisonment" is important, it is not necessary in every case. *Id.* at 861. Section "3553(a) does not command courts to send the strongest message possible; it commands them to impose a sentence that is "sufficient, *but not greater than necessary*" in the circumstances of each case. *Id.* (citing 18 U.S.C. § 3553(a) with emphasis).

In our system, we incarcerate only when necessary. Weighing Ben's temporary bad choices against the paramount good he has done and continues to do in the world, his rehabilitative value far outpaces any systemic value in

15

incarceration. Ben is already on a healthy, pro-social, stable, and productive path. Prison would traumatically sever exactly the progress we want to encourage.

## V. CONCLUSION

Ben's work for the rule of law, decade of wrongful imprisonment, commitment to family and hard work, and exemplary performance on pretrial release countervail his conduct in this case by significant measure. In Mr. Baker's unusual case, an incarceration sentence would in fact be greater than necessary to accomplish the goals of sentencing.

Wherefore, for all the reasons set forth herein, Ben Baker respectfully requests that this Court confer a sentence of probation.

Dated:   October 18, 2019          Respectfully submitted,

                                                       s/ Molly Armour
                                                      MOLLY ARMOUR
                                                      Attorney for Ben Baker

                                                      Molly Armour
                                                      Law Office of Molly Armour
                                                      4050 N. Lincoln Avenue
                                                      Chicago, IL 60618
                                                      (773) 746-4849
                                                      armourdefender@gmail.com