NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
|     Plaintiff, | ) | |
| | ) | No. 18 CR 216 |
|   v. | ) | |
| | ) | Honorable Charles R. Norgle |
| BEN BAKER, | ) | |
|     Defendant. | ) | |

**EXHIBITS A-Q TO**
**BEN BAKER'S SENTENCING MEMORANDUM**

| | | *Page* |
|---|---|---|
| Clarissa Glenn "Baker" Letter (partner) | Exhibit A | 4 |
| Joshua Tepfer Letter (attorney and friend) | Exhibit B | 7 |
| Jason Lofgren Letters (employer) | Exhibit C | 12 |
| Megan Dunn Letter (employer) | Exhibit D | 15 |
| Clarence Glenn Letter | Exhibit E | 17 |
| Roger and Javette Baker Letter | Exhibit F | 19 |
| Lamonica Lee Letter | Exhibit G | 21 |
| Carol Baker Letter | Exhibit H | 23 |
| Denisia Bell Letter | Exhibit I | 25 |
| Gale Miller Anderson Letter | Exhibit J | 27 |
| Marva Baker Letter | Exhibit K | 30 |
| Jasmine Cheers Letter | Exhibit L | 32 |
| IDOC Letter | Exhibit M | 34 |
| IDOC Certificate | Exhibit N | 36 |
| Illinois Court of Claims Order (Dec. 13, 2018) | Exhibit O | 38 |
| CL Report of Oct. 17, 2005 Meeting | Exhibit P | 42 |

Jennifer Gonnerman, *How One Woman's Fight to Save Her Family Helped Lead to a Mass Exoneration*, NEW YORKER (May 28, 2018)

Exhibit Q

*Page* 45

Dated:     October 18, 2019

Respectfully submitted,

s/ Molly Armour
MOLLY ARMOUR
Attorney for Ben Baker

Law Office of Molly Armour
4050 N. Lincoln Avenue
Chicago, IL 60618
(773) 746-4849
armourdefender@gmail.com

# Exhibit A

Judge Charles R. Norgle
U.S District Court for the Northern District of Illinois
219 South Dearborn
Chicago, Illinois 60604


Dear Judge Norgle,

My name is Clarissa Glenn Baker, I am a mom, partner, Christian, and a supporter. I am writing on my own behalf to inform you about Ben Baker, who is my partner in life, my confidant, the father of my three children, my husband, and basically my life for the last 28 years. We grew up together and we learned how to be parents together, we've had some trials and tribulations but through it all we are still standing strong.

Ben is the ying to my yang when I am serious he brings the humor. When I am uncertain he brings certainty and not just for me but for the family as well. When there is a family gathering the first question anyone asks will Ben be there? That is a testament to who Ben is. Everyone wants to be around him. His positive energy and wit brings laughter and good times to all.

In 2006, Ben was wrongfully convicted and went to prison. This was one of the worst periods of my life. I lost my soul mate, my spouse and most importantly the father to our kids. I have suffered from depression, anxiety and loneliness.

Ben was released from prison after serving ten years. Ten years away from family, missing not only family but our own children's graduation, ten years of birthdays, ten years of not just his life but all the lives that were impacted by this wrongful conviction. Not having Ben home has been such a dark place in my life. I didn't have his touch or kind eyes to look at me and say it will be ok. I was also convicted of a crime I never committed and due to this horrible circumstance I lost employment, my home, transportation, and overall life. Sitting here writing this letter was very emotional remembering the darkness I endured while Ben was taken away. It was a huge loss without having my heart by my side.

On January 2016, Ben was released from prison. This was not an easy new start to life. It was so difficult to start fresh, his family was in disarray, his children were adults, his personal life was in shambles, and his mother's health has declined.

After many prayers things began to look up for us. In February 2016, Ben was awarded not one but two certificates of innocence for his wrongful convictions. However, Ben could not get a job. Without employment our boys did the best they could to support us financially. Ben applied to numerous jobs to no avail, even with certificates of innocence in hand. I knew firsthand the challenges that he would face as I went through similar situations in finding employment due to my wrongful conviction as well. To have your children taking the financial responsibility of the household is a very humbling experience. However we remained hopeful that this burden would soon be lifted from our shoulders.

1

In April 2017 Ben and I joined Apostolic church where our faith helped guide us both to a better understanding towards one another and knowing that we could not overcome these challenges without one another. In summer 2017 Ben was finally awarded compensation for his wrongful conviction. Ben kept working to find a job. We both were truly grateful when Ben was able to become employed by ADE Inc. in November of 2017.  After I was exonerated, I was finally able to obtain employment at Dental Dreams in Chicago as a receptionist.  I have been here for a year and a half.

I was shocked, disappointed and scared when Ben was arrested in this case in April 2018.  While at the time I had no idea about his actions, I understood that he wanted to support his family while doors were closing on us.  I know it was a terrible decision, but all we can do is pick up and move forward together.

Unfortunately in July 2018, Ben unexpectedly lost his uncle John Lee Baker who left behind 6 kids and many grandkids, and great grandkids. Ben stepped up and took on much of the expenses for the service. And still to this day his uncle's kids and grandkids call, visit, and attend family gatherings. Five months later Ben received another blow where he lost an aunt Vivian Baker in December 2018. This was another unexpected loss not just to Ben family but also to the community. Ben knew he wanted to lay his aunt to rest and took care of the entire cost of the services. This speaks volumes of how much Ben loves his family, and supports them even during death.

Having the loss of two important older family members Ben was determined to keep his family close. He came up with the idea of having monthly family events, even if it's just a meal, free events in the park, or visiting loved ones that are out of town or in town. Thankfully, with the Courts permission for movement he was able to accomplish one of his most important goals - keeping family together.

Raising three sons for ten years alone was challenging, I did the best I could, I made sure that they all graduated from highschool and were upstanding citizens in society. I am a witness that boys need a father in their life.  When Ben returned to our family, I could see our sons stand a little taller, they began to talk a little more, they went to their father for everything. It made me sad and proud at the same time as I know that they missed him and need their dad.  Ben was able to get our oldest son to attend truck driving school to obtain his CDLs. Ben was able to get our middle son to finish his college education and obtain his undergraduate degree. Ben was able to get our youngest son to follow his dream of working with animals and he now an entrepreneur where he uses his skills as a dog groomer.

Ben set out on a new journey of his own, which was to obtain his CDL.  And in 2019 he did just that. We have discussed owning our own trucks and possibly a trucking company. Because of the belief that the family has in him our oldest son will also obtain his CDL in November 2019, and his oldest sister and husband will be attending truck driving classes in the near future. Your honor permitted him to obtain employment with System Transport Trucking. But after a few months he decided that he would rather be home with his family than on the road alone. Thankfully ADE still had open arms for him - so he decided to go back. In the future, Ben hopes to continue truck driving and start his business so that he can better provide for his family financially and be able to give employment for those in need.

2

Ben and I discussed being more active in our new twin grandkids lives, we discussed our dream home, moving out of town, we spoke of getting remarried, and continue to keep our family close. After so much struggle, it is amazing to finally see things are on the right track.

So your Honor as you see this is why I am pleading with you to allow him to continue to grow, and be supportive. We have lost so much and now rebuilding so much. I don't want to avoid why we are here today which is that Ben made a huge mistake. But, I know Ben is definitely much bigger than those choices he made. On behalf of my children and myself please allow him to continue on our journey.

Thank you for taking the time to read my letter.

Sincerely,

Clarissa Glenn

Clarissaglenn123@gmail.com

708-970-4051

3

# Exhibit B



# Exoneration Project
## at the University of Chicago Law School

311 North Aberdeen St., Suite 2E, Chicago, Illinois 60607 I ExonerationProject.org
P 312-789-4955 I F 312-588-7276 I E info@exonerationproject.org

October 11, 2019

Honorable Judge Norgle
United States District Court
Northern District of Illinois
Everett McKinley Dirsksen U.S. Courthouse
219 South Dearborn St., Courtroom 2341
Chicago, IL 60604

     Re:    *USA v. Ben Baker*, 18 CR 216

Honorable Judge Norgle:

I write this letter in support of my long-time client and friend Ben Baker. My name is Joshua
Tepfer, and I am an attorney and lecturer-in-law with the University of Chicago Law School's
Exoneration Project, as well as a Partner with the civil rights law firm of Loevy & Loevy. I met
Ben in 2015 when I joined the Exoneration Project and he became my client. He has remained
my client through the exposure of his wrongful conviction in January 2016 and release from
prison after nearly a decade, and I now represent him in a pending civil rights matter related to
his wrongful convictions.

I have represented many, many men and women throughout my 15-year career of defending the
criminally accused. I can count on exactly three fingers the clients that have developed a close
and personal relationship with me and my family. Ben, his long-time partner Clarissa Glenn, and
their three boys (Ben, Jr., Gerard, and Deon), are one of them.

I have welcomed Ben and his family in my home, and he has done the same to me. Ben and his
sons have sat on the floor in my living room and played Uno with my then 7 year-old son.
Clarissa and her sons have sat at a picnic bench drawing pictures and doing crafts with my two
daughters (now 5 and 11) while Ben and I played catch at a barbeque. Clarissa and my wife Beth
have sat at my dining room table drinking coffee, while Ben and I sat on my couch talking NBA
basketball or trying to one-up each other with stupid jokes. Ben and his family have twice come
to my place of worship (Oak Park Temple) as my guests and presented their family's story to my
temple community. They then met privately with children and their families at the temple to
write letters to individuals incarcerated as part of our temple's "Mitzvah Day." (The Hebrew
word Mitzvah is roughly translated as "good deed.")

Page 2

## The Exoneration Project
### at the University of Chicago Law School

All of these interactions and events are fondly etched in my mind. They have occurred both before and after Ben's arrest on this case, and they will continue after Ben's sentencing is complete, even if Your Honor determines it must wait until after Ben serves a period of incarceration. Ben, Clarissa, and their family are part of my family's life, and that will continue.

Personally, I just absolutely love spending time with Ben. Perhaps it is cliché, but his personality and smile light up a room. He is tremendously good-spirited and funny. I've never heard him raise his voice. He is self-assured enough to laugh when he is the target of a soft ribbing or joke, and he is witty and kind enough to make me laugh at myself when I'm the target. Ultimately, however, I think we connect because we share the same familial values. I admire his relationship with his sons, and the way they love and respect him. But most of all, I truly admire his relationship with his wife Clarissa—he (correctly) recognizes her brilliance and resilience. He shows her the tremendous respect and admiration she deserves. Their loving and supportive relationship is one to model.

You need not take my word for it that Ben puts his family first. There is proof, and it involves Ben and Clarissa's more than decade-long journey to expose both their own wrongful convictions and the corruption of former Chicago Police Sgt. Ronald Watts and his team. Ben and his family's journey is a long, complicated, and compelling story. But for the purposes of this letter, you should know the following: From the summer of 2004 through December 2005, Sgt. Watts and his team planted drugs and attempted to frame Ben three different times. On the first occasion in the summer of 2004, Ben "beat" the case in court. The second occasion in March 2005 was retaliation for Ben "beating" the 2004 case. The third occasion in December 2005 was in direct retaliation of Ben and Clarissa doing everything they could over that time period to expose to federal and local law enforcement entities the officers' systemic corruption that continued to victimize them and other citizens in the Ida B. Wells housing projects. These efforts are well documented in law enforcement reports. The false charges in December 2005 were perhaps the worst because these corrupt officers ensnared Clarissa, who had never had so much as a parking ticket before this wrongful arrest.

With that backdrop, your Honor should know that in May and June of 2006, Ben went to trial on his March 2005 wrongful arrest, facing the most serious of drug charges. He truthfully testified in his own defense—telling the court about the systemic corruption and lies of Watts and his team. At the time, the Cook County Circuit Court believed the officers' lies, and ultimately sentenced Ben to 14 years in prison.

After those proceedings were complete, Ben and Clarissa had to grapple with the charges related to the December 2005 arrest, and, in particular, the State's one-time offer to both Ben and Clarissa to plead guilty in exchange for Ben receiving an additional four-year sentence and Clarissa receiving probation. Clarissa—who to this day maintains her belief in a just and fair legal system—was adamant in her refusal to plead guilty. But as Ben put it in his sworn affidavit, he "pleaded and begged her" to take the deal. Ben "would have taken any amount of time on this second drug charge with an assurance that Clarissa would not be imprisoned." His "primary

motivation was to ensure Clarissa was not imprisoned" and their children—ages 11, 12, and 13 at the time—"would have their mother to raise them." Ultimately, Ben persuaded Clarissa to allow him to serve extra time in prison so Clarissa would not have to and his children would not be orphaned.

I am forever moved by this story of Ben's singular focus to protect his family at his own personal expense of more unjust prison time. And make no mistake about it: This is a story that is demonstrably true and now acknowledged by law enforcement and the judicial system. Ben and Clarissa have been certified innocent of both cases as Watts and his team's corruption continues to be exposed, perhaps best exemplified by the fact that, to date, the Cook County State's Attorney has voluntarily dismissed 83 drug convictions of 62 individuals since Ben's conviction became the first to be dismissed in January 2016.

This leads me to the final point I would like to make about what I admire about Ben's character—his courage. Ben and Clarissa have loudly and publicly spoken up about their wrongful conviction and the misconduct of Watts and his team since Ben's release from prison. They have continued to do so after Ben's second conviction (and Clarissa's only one) was overturned in March 2016. And there is a direct and straight line from Ben and Clarissa's willingness to speak the truth publicly to the fact that 60 other victims of these officers have received justice.

Taking a step back to the year 2005 and the story I told above, consider that it was Ben's attempts to expose the Watts team misconduct that directly led to the two retaliatory false charges that put him in prison wrongfully for a decade. Despite this history and experience, immediately upon his release Ben and Clarissa did not hesitate to continue to speak out to expose this misconduct. This is a profile in courage. All the more so considering that many of the officers from Watts team were still on the police force a decade later and had faced no repercussions. Ben and Clarissa's outspokenness has changed that: These officers are beginning to face consequences (many have been put on administrative desk duty and the Cook County State's Attorney's Office will no longer call them to testify) and our City and its citizens are better for it. As courts across the State of Illinois have recognized, Ben and Clarissa are to thank for that.

I will end this letter by speaking to the current criminal charges. Perhaps the best way I could do so is to speak to the timeline. Ben was wrongfully incarcerated from the summer of 2006 through his abrupt release on January 2016 when the Cook County State's Attorney dropped the charges. Having spent most of my career representing the alleged wrongfully convicted, a frequent refrain from those victimized by wrongful conviction is that the system is not set up to correct mistakes. That is, when the innocent are released from prison, they are left with far less support than the guilty who are released. The guilty remain under government control under a period of supervised release or parole. Whatever the obvious drawbacks to personal freedom, this system—when properly instituted—allows motivated individuals to receive assistance with

**The Exoneration Project**
<u>at the University of Chicago Law School</u>

Page 4

community re-entry, such as job assistance and training. The innocent, however, are left on their own.

About a decade ago, the Illinois legislature attempted to address this hole by enacting a certificate of innocence statute. The intent was for those wrongfully convicted to be certified as such and to receive statutory compensation quickly to give them resources to attempt to recover from their time away from society. In Ben's case, he did get certified innocent just a month after his release in February 2016; however, due to Illinois' budgetary issues, he did not actually receive compensation for his wrongful conviction until July 21, 2017—or 18 months after his release from prison.

During those 18 months, much like many of my exonerated clients, Ben struggled to find work and provide for his family. I sent many inquiries to friends and colleagues in an attempt to help, and I know Ben filled out many applications and went to many job fairs. Ultimately, one of those inquiries paid some dividends, and a friend of a friend of a friend, Jason Lofgren, got in contact with me and agreed to interview Ben. Mr. Lofgren did interview Ben in May 2016. He followed up and told me that Ben would be the first person he would hire when a position opened up, but there were no openings at the moment. Mr. Lofgren, ultimately, kept his promise, and contacted me on November 28, 2017 to say that if Ben was still looking for work, Ben could start immediately. Ben started two days later. The court received a copy of Mr. Lofgren's letter as part of the bond hearing in this case and it likely remains in the court file. This letter powerfully speaks to Ben's character and work ethic.

Ultimately, it is at least worth noting that the incidents that led to charges in this case began in March 2017, or nearly 14 months after Ben's release from prison. It came at a time when I know Ben was extremely frustrated by his unsuccessful 14-month-long efforts to find work and provide for his family. And I think it is equally worth noting that there are no allegations of criminal conduct from after the time Ben began work in November 2017 through his arrest and then charges in May 2018 or since.

It is my firm and sincere belief that Ben will not make the same mistake again. It is my firm belief that Ben will comply with any terms of probation this Court would require if it were willing to choose a sentence that did not involve incarceration. I believe his compliance with all bond restrictions over the last year-and-a-half demonstrate as such. For my part, I will do what I can to support Ben and his family regardless of this Court's sentence.

Thank you for your time in reading this letter. I will be in court during Ben's sentencing hearing to support him and his family and will be available to address any questions from your Honor.

Sincerely,

Joshua Tepfer

# Exhibit C



**ADE, INC.**
Packaging For What's Fragile in Your World

Honorable Court:

I'm writing this letter on Ben Baker's behalf to inform the court that Ben has been, and I hope continues to be, an outstanding employee for ADE, Inc., a family owned packaging manufacturer located on the southside of Chicago.

Ben started work for us on November 30, 2017 and is still employed to this day. Ben has been an exemplary employee from the start learning new machines and production positions that are crucial to our success. For instance, Ben is one of only two line employees capable of operating our Base Machine which is a two-man job, thus we already have an immediate concern with regard to our ability to produce product if Ben is unable to continue on with us.

I can personally attest to Ben's outstanding work ethic as I have worked alongside him on the plant floor. Back in December of 2017, almost immediately after Ben was hired, we were running six, and even seven days a week as we were extremely short staffed and orders were backed up. We were so busy that it was an all hands-on-deck situation and the office staff was needed and required to work in the plant. Ben and I worked together on our window-patcher machine. After working seventeen straight days, most of which were twelve-hour shifts, there was no deterioration in the quality of Ben's work or any type of bad attitude displayed at having to work for so long. He truly was a pleasure to work with.

One last side note on Ben's character was when the entire company was invited to a celebratory dinner for our Operations Manager's fiftieth birthday. Ben never had an alcoholic drink that night at the restaurant. I don't know if Ben does or does not drink but he had the control and wherewithal that night to be nothing but a perfectly pleasant guest.

I not only would welcome Ben back to ADE to continue his employment but I am truly hoping that he can return as soon as possible.

Finally, I've gone through Ben's personnel file and he has no documented disciplinary actions nor has he been late to work even once during his time of employment with us.

I very respectfully ask the court, if at all possible, to let Ben return to his life and continue on with ADE, we do truly miss him.

Respectfully,

Jason C. Lofgren
President
ADE, Inc.
1430 East 130th Street
Chicago, IL 60633
773-646-3400, Ext. 246



**Packaging For What's Fragile in Your World**

To Whom It May Concern:

I'm writing this letter on Ben Baker's behalf to inform the court that Ben has been, and I hope continues to be, an outstanding employee for ADE, Inc., a family owned packaging manufacturer located on the southside of Chicago.

Ben started work for us on November 30, 2017 and is still employed to this day. Ben has been an exemplary employee from the start learning new machines and production positions that are crucial to our success. For instance, Ben is one of only two line employees capable of operating our Base Machine which is a two-man job, thus we already have an immediate concern with regard to our ability to produce product if Ben is unable to continue on with us.

I can personally attest to Ben's outstanding work ethic as I have as I have now observed him for over a year. He continues to be an exemplary employee, whom his co-workers look up to. This is further proved in that Ben has no documented disciplinary actions. I can definitely state that not only is Ben's work outstanding but his calm, well-mannered and intelligent disposition positively effects those he works with - making for a better environment for all. As we are a small shop to have an employee like Ben is very much a service and benefit to ADE, Inc.

Respectfully,

Jason C. Lofgren
President
ADE, Inc.
1430 East 130th Street
Chicago, IL 60633
773-646-3400, Ext. 246

# Exhibit D



**ADE, INC.**
Packaging For What's Fragile in Your World

January 11, 2019

To Whom It May Concern:

I'm writing this letter in reference to an ADE, Inc. employee Ben Baker.

Ben started work for ADE, Inc. on November 30, 2017 and remains a valued employee to this day.

I am continually impressed with Ben's work ethic, willingness to learn, and dedication to producing exceptional work since ever since the day he started.

I have never had an attendance, behavioral or performance issue with Ben, and beyond that he is willing to work overtime whenever it is asked of him. He is a friendly and up beat coworker, always willing to help regardless of the job.

Due to Ben's exemplary performance, we have been able to cross train him on all of our production lines. Ben's knowledge of all lines allows us to schedule him at any workstation needed, significantly increasing his value as an employee. Ben is currently one of two employees that can run a machine that requires 2 people to operate. Without Ben, this product line would be in jeopardy.

ADE is a small, family owned business. Our people are our most important asset. We have a small team that gets a lot done. It wasn't easy but we have built a team that works together exceptionally. To remove an employee, especially Ben, from that team would have a great impact on our ability to produce, but also on morale. Ben is family to us, and we would miss him more than I'm able to express if he were no longer working at ADE.

I look forward to working with Ben for many years to come and I hope I have the opportunity to do so.

Respectfully,

Megan M Dunn
Executive Vice President
ADE, Inc.
1430 East 130th Street
Chicago, IL 60633
773-321-2714

# Exhibit E

To Whom It May Concern,

I have known Ben Baker for all of my life. He is my brother-in-law through his marriage to my sister Clarissa. While many of my interactions with Ben have been through family get-togethers and occasional outings, there is one facet of his character that has always shone through, his dedication to his family. No one who really knows Ben can question his love for his family and his will to ensure their well-being. I have been fortunate to see the way he supports my nephews, his sons, no matter what. Even when their decisions are misguided, he is willing to put an arm around them and try to guide them back to the right path. It is evident how much he loves my sister and he displays what I believe the true mark of a man by always putting her first and is not afraid to be vulnerable with her. The reason I am writing this letter is not lost on me and it is unfortunate. As sad as I am, I know that Ben feels worse and just wants to be able to support and provide for his family. I have known bad people and Ben Baker is not that. I respectfully ask that this small piece of information is taken into account for my brother.

Thanks for your time,

Clarence Glenn

# Exhibit F

We Rogers and Javette Baker are
writing this letter on behalf of Ben
Baker. Who, despite the challenges
he endured in life, have over come
obstacles and refuse to allow these life
altering events to define who He is.
He is a loving father to his children, whom
he encourages to live honest lives and
advance in Career paths. He is a devoted
Husband to his wife, with whom he
do motivational speaking to youth in
different communities, teaching them
the dangers of criminal lifestyles. He
strives to be an positive role model
for his children and extended family
members, seeking career paths to set
a better example for them.

Your Honour, we ask that you see
him for the man he is today, a loving family
man, a positive influence for those around him
near and far. We ask you to show leniency
for who he has become.

# Exhibit G

Dear Honorable Judge Charles R. Norgle,

I am Lamonica Lee, Ben's niece. I am writing the court on Ben's behalf to let you all know how much Ben is needed to be home with his family. My uncle is a wonderful god father, father figure, and uncle to my two children. My children lost their father to gun violence back in July of 2017 and my uncle stepped up and have been there since day one. He has watched the kids for me when I needed a babysitter (when schools are closed) he had pep talks with my kids (when my kids are missing their father). Judge I know my uncle has broken the law and a decision has to be made. I am asking that you please keep my uncle in arms reach so that my kids can continue to have a father figure in their life.

Sincerely,
Lamonica Lee
Lamonica.lee@yahoo.com
480-868-1742

# Exhibit H

Dear your Honor Charles R. Norgle,

I am writing this letter to let you know that my cousin Ben is a great guy and sometimes people do the wrong thing for the right reason. Ben is the glue that holds our family together. Since Ben has been home, he has repaired our broken family. Ben has supported my daughters in all their extra-curricular activities; he has taken all three of them to get their licenses, he took them on outings and all the in person support ended when he was put on home confinement, however, he finds time to call and check up on them because they are fatherless. Ben is the reason why our family started back having our family reunion and I feel it in my heart if he gets locked back up our family reunion will end again. There were only a handful of males born into our family and Ben being one of the oldest since my Uncle Lee death, has inspired the majority of our family members to go back to school for their certifications or degrees. I know Ben has learned his lesson and he only wants to do things the right way, so you honor, I am asking you to have leniency on him for the sake of our family.

Best Regards,

Carol Baker

312-388-6471

Cbaker39@att.net

# Exhibit I

Dear Judge Norgle,

      My name is Denisia Bell and I am writing this letter on behalf of my cousin Ben Baker. Ever since he came home Ben has been good to our whole family. Whenever I needed something he was there. Ben took time out of his day to take me and my sisters to get our driver's license. He is like the father of the family. When our family was dealing with the loss of my Aunt Vee, Ben  decided to pay for the funeral without asking for help from other family members. He has brought nothing but laughter and joy to our family. It is very important to have him home because he is the male backbone of the family. Ben has helped family members solved their issues with each other and helping them to become close once again. We have been planning more family outings such as bowling, going out to the movies and out to eat.  Our family is happier now that he's home.

Sincerely,

Denisia Bell (312)765-3482

# Exhibit J

Dear Judge

My name is Hale Miller Anderson one of Ben's older Sister's. I'm writing to inform the courts on how Ben impact my life in more ways then I can thank him enough. Since my grandmother's passing in 1985 I had lost hope and unity within myself and family. It sent my life spiraling down hill which caused my drug addiction. During that time Ben was the only one who encouraged me to change my life for the better. I am proud to say I achieved that accomplishment. During the time Ben was removed from my life which caused a huge part of my (PTSD) Post Traumatic Stress Disorder diagnosed by my Psychatrist. His absence played a huge part in my illness, which separated me from family and friends Ben returning

home gave back my support
and encouragement. I am asking
the courts to take into
consideration that Ben is loved
and needed.

Sincerly
Gale Miller Anderson

# Exhibit K

Dear Judge Norgle,

   My name is Marva Baker I am writing on behalf of Ben Baker, my nephew. Ben is a large help to our family. He is a huge help to my grandson Perrish Lewis who is 6 years of age. Perrish is having a hard time coping with the loss of my sister and brother who passed about a month apart. Because of Ben he has stepped in as a father figure and support figure to my grandson. Ben has a role model to our younger generation of our family. He is an inspiration to his elders by motivating us to stay strong, and letting us know we are not alone. He is the only nephew who calls on a regular and visits as often as he can. He is my nephew and it would be a great loss not having him around.


Sincerely,

Marva Baker

312-371-1465

# Exhibit L

My uncle Benny is an amazing man. Even though he's my uncle, I look at him like a dad. He is such a blessing in my life. He was there at times when I was really lost and confused. Some gave up on me but he didn't. He was right there to give me encouraging words, big hugs and to tell me to never give up, pick my head up and keep going. He is very enthusiastic person who transmits his joy to all. He is the one who keeps the family together. He makes everyone smile and laugh with his big outstanding personality. My uncle Benny not only a role model to me but also my two sons. When he is around the family know no matter what hardships we face, we will get through them and everything will be okay.

-Jasmine Cheers

# Exhibit M



**Illinois**
Department of
**Corrections**

**Pat Quinn**
Governor

**S. A. Godinez**
Director

Pinckneyville Correctional Center / 5835 State Route 154 / Pinckneyville, IL 62274-3410 / Telephone: (618) 357-9722 / TDD: (800) 526-0844

February 6, 2015

Re: Ben Baker, B59639

To Whom It May Concern:

This letter is written on behalf of Ben Baker. The Illinois Department of Health has developed an educational program titled Reach One – Teach One. The program was designed to inform offenders and help them assimilate information on STDs, HIV/AIDS and Hepatitis. Mr. Baker has completed all studies and has been certified by the Department of Health as a Peer Education Presenter.

Mr. Baker has been involved with this program during his incarceration at Pinckneyville Correctional Center. He has a very thorough knowledge and a true passion for the information and portrays this in his presentation. He is very comfortable with the material and easily answers any questions that arise.

Mr. Baker has also participated in facilitating the Fatherhood Program, Substance Abuse classes, TRAC 1 program & monthly Hot Topic sessions.

Mr. Baker would be an asset in any forum that is designed to educate individuals on the risks involved, as well as the prevention and treatment of these diseases.

Vicki Hubbard CCII
Vicki Hubbard
Correctional Counselor II
Peer Educator Coordinator
Pinckneyville Correctional Center

Tracey Laird CCII
Tracey Laird
Correctional Counselor II
Peer Educator Coordinator
Pinckneyville Correctional Center

# Exhibit N



# ILLINOIS DEPARTMENT OF PUBLIC HEALTH

## Certificate of Achievement

This is to certify that

### Ben Baker

B596639

has satisfactorily completed the

**REACH-ONE TEACH-ONE TRAINING**

conducted under the auspices of the

IDPH AIDS SECTION & IDOC HEALTH SERVICES

LaDaryl Hale, IDOC Health Services

August 6th 2013

BAKER GLENN 22692

# Exhibit O

**IN THE COURT OF CLAIMS
OF THE STATE OF ILLINOIS**

FILED
COURT OF CLAIMS

DEC 1 3 2018

Secretary of State and
Ex-Officio Clerk Court of Claims

| | | |
|---|---|---|
| Clarissa Glenn, | ) | |
| Claimant, | ) | |
| | ) | |
| vs. | ) | No.  19 CC 0568 |
| | ) | |
| State of Illinois, | ) | |
| | ) | |
| Respondent. | ) | |

## ORDER

Clarissa Glenn is before the Court seeking recovery pursuant to 705 ILCS 505/8(c).

Ms. Glenn received a certificate of innocence from the Circuit Court of Cook County on September 27, 2018.

Ms. Glenn was found to be factually innocent of the charges for which she was convicted on April 5, 2016.  At that time, she petitioned for a certificate of innocence under 735 ILCS 5/2-702. That statute provides in pertinent part:

"In order to obtain a certificate of innocence the petitioner must prove by a preponderance of evidence that:

(1)     the petitioner was convicted of one or more felonies by the State of Illinois and subsequently **sentenced to a term of imprisonment, and has served all or any part of the sentence**;

(2)(a)  the judgment of conviction was reversed or vacated, and the indictment or information dismissed or, if a new trial was ordered, either the petitioner was found not guilty at the new trial or the petitioner was not retried and the indictment or information dismissed; or (b) the statute, or application thereof, on which the indictment or information was based violated the Constitution of the United States or the State of Illinois." (Emphasis added.)

Based upon its review of the statute, the Circuit Court declined to issue a certificate of innocence because Ms. Glenn received a one-year probationary sentence and was not incarcerated. Ms. Glenn appealed.

In June of 2018 the Appellate Court First District reversed the findings of the Circuit Court.

1

In *People v. Glenn*, 218 Ill. App. (1st) 161331, the Court held that a circuit court may issue a certificate of innocence to a person sentenced only to probation.

The Court of Claims Act at 705 ILCS 505/8(c) provides that the Court has exclusive jurisdiction to hear and determine "[a]ll claims against the State **for time unjustly served in prisons** of this State when the person imprisoned received a pardon from the Governor stating that such pardon is issued on the ground of innocence of the crime for which he or she was imprisoned or he or she received a certificate of innocence from the Circuit Court as provided in Section 2-702 of the Code of Civil Procedure." (Emphasis added.)

The preamble to the certificate of innocence statute, 735 ILCS 5/2-702, states in Section (a): "The General Assembly finds and declares that innocent persons who have been wrongfully convicted of crimes in Illinois and subsequently imprisoned...should have an available avenue to obtain a finding of innocence **so that they may obtain relief through a petition in the Court of Claims.**" (Emphasis added.)

In construing these statutes together with the well-reasoned opinion of the Appellate Court, this Court finds that the issuance of a certificate of innocence by a circuit court affords those wrongfully convicted to seek compensation under the Court of Claims Act where the claimant received probation.

The statute governing the Court of Claims gives this Court wide latitude in the amount of compensation this Court may award (subject to a maximum) based upon the years of incarceration.

We review the petition for compensation *de novo* and adjudicate awards based upon the record.

The statute provides for maximum compensation for those imprisoned for 5 years or less to be $97,075.00.

In the instant case the Claimant presents an extraordinary argument for compensation even though she only received a one-year term of probation.

Ms. Glenn was one of many individuals who were wrongfully convicted as a result of one of the most staggering cases of police corruption in the history of the City of Chicago.

Chicago Police Sergeant Ronald Watts and his team of police officers ran what can only be described as a criminal enterprise right out of the movie "Training Day".

Watts and his team regularly shook down drug dealers and other residents of the Ida B. Wells housing project. On many occasions when these residents refused to pay the extortive demands the Watts crew would fabricate drug charges against them.

Clarissa Glenn was married to Ben Baker and lived in the Wells projects. Ben had a history of small time drug dealing and other crimes. Clarissa had no criminal record.

Watts and his crew would shake down Baker regularly. But Baker refused to pay the protection money. Clarissa would regularly intervene in these shakedowns to the consternation of the corrupt police crew. Clarissa complained of the Watts crew's conduct to the Chicago Police Office of Professional Standards ("OPS").

Someone in OPS disclosed Clarissa's name as a complainant to Watts. Soon thereafter, the Watts crew planted drugs on Baker and Clarissa and charged them both.

Ms. Glenn and Mr. Baker had three young children. With Mr. Baker headed to prison, Clarissa reluctantly pled guilty and received probation.

Both before and after her arrest Clarissa and her lawyer doggedly pursued the corruption of the Watts crew. She spoke with the public corruption unit of the Cook County State's Attorney, the Chicago Police Department and ultimately the FBI who she assisted in recruiting informants to catch the Watts crew extorting money.

She is credited with being a factor in the arrest and conviction of Watts. The Cook County State's Attorney has thrown out convictions in more than 30 cases with more expected. We award Ms. Glenn $97,075.00.

ENTER:

_____
CHIEF JUSTICE, Court of Claims

CONCURRING:

_____ J.

_____ J.

The filing date stamped hereon is the filing date of this Order.

# Exhibit P

# CL REPORT

**CL:** 050448      **CASE NUMBER:**

**UNIT:** GOV & FIN CRIME      **CHARGE:** BRIBERY/INTIMIDATION/OFFICIAL MISCONDUCT

**ASA:** NAVARRO, DAVE      **RD:**      **OPS CR:**

**JUDGE:**      **AGENCY:** PVT. ATTY

**REQUESTOR:**      **SOURCE:** MATTHEW MAHONEY

**NOTE:** SOURCE OF CASE, ATTORNEY MATTHEW MAHONEY CONTACTED OUR OFFICE STATING THAT OVER THE PAST 1-1/2 YEARS HE HAS REPRESENTED SEVERAL CLIENTS IN NARCOTICS CASES, ALL OF WHOM INDEPENDENTLY STATE THAT THEY HAVE BEEN VICTIMIZED BY THE TARGET IN A SIMILAR FASHION.

TARGET IS A 2ND DISTRICT SERGEANT WITH THE CHICAGO POLICE DEPARTMENT WHO REGULARLY PATROLS THE 527 EAST BROWNING BUILDING, WHICH IS LOCATED IN THE IDA B. WELLS CHA HOUSING PROJECTS. TARGET IS ALLEGED TO BE ON THE PAYROLL OF NARCOTICS DEALERS AND DOES NOT INTERFERE WITH THEIR NARCOTICS SALES OPERATIONS.

THE TARGET AND SEVERAL OTHER POLICE OFFICERS ALSO ROUTINELY RECOVER NARCOTICS FROM INSIDE APARTMENTS AND FROM INDIVIDUALS. IT IS ALLEGED THAT THE OFFICERS ARREST INNOCENT INDIVIDUALS AND PUT CASES ON THEM IF THEY DO NOT PERIODICALLY PAY THE TARGET. VICTIM 1 ALLEGES THAT THE TARGET HAS EXTORTED MONEY FROM HIM ON THREE DIFFERENT OCCASIONS BUT HAS NOT PAID THE TARGET. AS A RESULT OF HIS FAILURE TO PAY, THE TARGET HAS ARRESTED VICTIM 1 ON THREE OCCASIONS AND CHARGED HIM WITH FELONIES. WITNESS 1 IS CREDIBLE AND CORROBORATES VICTIM 1'S ALLEGATIONS TO A LARGE EXTENT.

VICTIM 1 CLAIMS THAT THERE ARE SEVERAL OTHER INDIVIDUALS WHO HAVE BEEN SIMILARLY VICTIMIZED BY THE TARGET. VICTIM 1 ALLEGES THAT SEVERAL OF THESE INDIVIDUALS HAVE LODGED FORMAL COMPLAINTS WITH THE OFFICE OF PROFESSIONAL STANDARDS. IN ADDITION, THE SOURCE OF THIS CASE CLAIMS THAT HE HAS REPRESENTED SEVERAL OF THESE INDIVIDUALS.

| SUBJECT | SUBJECT NAME | ATTORNEY | GANG |
|---|---|---|---|
| 01 | WATTS, SGT. RONALD | | |

**Place of Employment:** CHICAGO POLICE DEPARTMENT #2640      **Phone**

**Address:** , ,      **IR_NO:**

**DOB:**

IAP NOTE :: 1) Contact OPS and obtain files relative to any complaints filed against the target.
2) Source of case will provide police reports of cases where he has represented clients who have complained of target's activities.
3) If, after receipt of OPS files and the attorney files, there appears to be a pattern of criminal activity, contact Chicago Police Department, Internal Affairs Division to conduct a joint investigation with a view towards arranging a situation where criminal activity can be recorded via electronic/video. ***** SUPERVISORY NOTE::

## INCIDENT

## VICTIMS

Monday, October 17, 2005      Page 1 of 2

# CL REPORT

| | NAME | DOB | GANG | ETHNIC |
|---|---|---|---|---|
| 1 | BAKER, BEN | 5/24/1972 | | |
| | **Address:** 527 EAST BROWNING, APT 206 , CHICAGO, IL 60653 | | | |
| | **Phone:** | | | |
| 2 | GLENN, CLARISSA M | 8/30/1971 | | |
| | **Address:** 527 EAST BROWNING, APT 206 , CHICAGO, IL 60653 | | | |
| | **Phone:** | | | |

## EVENTS

| 01 | WATTS, SGT. RONALD | | |
|---|---|---|---|
| | 5/4/2005 | CL | **Scheduled Event:** |
| | Official Misconduct | | |

## DISPOSITIONS

Monday, October 17, 2005

Page 2 of 2

PL JOINT 009960                                    BAKER GLENN 009960

# Exhibit Q

THE
NEW YORKER

# SAVE HER FAMILY HELPED
# LEAD TO A MASS EXONERATION

*Clarissa Glenn set out to prove that a Chicago police officer framed her husband. Now the city is reckoning with years of wrongful arrests.*

**By Jennifer Gonnerman**

0:00 / 47:37

**Audio:** Listen to this article. To hear more, download the Audm iPhone app.

Clarissa Glenn's troubles with the law began on Mother's Day, 2004, when she was on her way to the Pancake House with her three sons—Ben, Jr., Gerard, and Deon. They left their apartment in the Ida B. Wells Homes, a housing project on the South Side of Chicago, to meet her partner, Ben Baker, outside the building. They found him talking with a police sergeant named Ronald Watts, a notorious figure in the project. Watts oversaw a team of police officers who were supposed to be rooting out the project's drug trade, but he was in fact running his own "criminal enterprise," as another officer later put it. Watts extorted money from drug dealers and other residents, and when they didn't pay him he fabricated drug charges against them. That morning, Ben said, the sergeant had tried to shake him down. Ben told him, "Man, fuck you. Do your motherfucking job," before walking away.

Clarissa and Ben, who were both in their early thirties, had been together since they were teen-agers. For seven years, they had lived with their sons in the Wells, as the project was known. Ben had grown up there and was used to dealing with

hostile, sometimes corrupt officers, but Clarissa, whose father had been a private detective, expected better treatment from the police. In the months after Ben's confrontation with Watts, whenever she saw a police officer talking to Ben she intervened, marching up to the officer and saying, "What's going on?" One time, as Clarissa approached, an officer said to Ben, "Here comes your lawyer."

On the afternoon of March 23, 2005, Clarissa saw from a window in their apartment that several officers had detained Ben, and she followed them to the police station. According to the police report, the officers had caught Ben with packets of heroin in one hand and packets of crack cocaine in his pocket. Prosecutors charged him with drug possession with intent to sell. Ben, who was unemployed and watched the boys after school, had a history of selling drugs, and he was three weeks away from finishing a two-year probation sentence for a drug case. If he was convicted of the new charges, he faced up to sixty years in prison. On April 2nd, he was released from jail pending trial. Clarissa, who worked as an administrator at a home-health-care agency, picked him up.

Ben said that Watts had framed him. Clarissa believed him, and so did his lawyer, Matthew Mahoney, who had represented him in a previous case, and had worked in the nineties as a prosecutor in the public-corruption unit at the Cook County state's attorney's office. In May, Mahoney accompanied Clarissa and Ben to the state's attorney's office, where they met with two police sergeants, an agent from the Chicago Police Department's internal-affairs division, and a prosecutor named David Navarro. Clarissa and Ben assumed that the authorities would be surprised to hear about Watts's conduct, but they held up one photo after another of Watts's team. "It was, like, Do you know who this is? Do you know who this is?" Clarissa recalled. "They were already investigating."

The state's attorney's office opened an investigation into Watts after Mahoney informed the office of Ben's case. The police department was known for consistently failing to address officer misconduct. In the previous two years,

although the department had received at least twenty-five complaints about Watts and his team—including allegations that they planted drugs on people—it allowed them to continue working in the Wells. Mahoney described the internal-affairs division as "notoriously, incredibly slow in doing anything—and they're incredibly full of leaks." As a prosecutor, he said, he never knew whether "they're going to leak your investigation to the target."

*Shaun James (left) and Taurus Smith insisted that officers planted drugs on them when they were arrested in 2004. Last year, a judge threw out their convictions.*

Photograph by Zora J. Murff for The New Yorker

That summer and fall, Watts continued to harass Ben and Clarissa. In October, Clarissa visited the police department's Office of Professional Standards twice to file complaints. According to police records, she reported that Watts "entered and searched her house on several dates without justification," and "threatened to take her to jail." (Watts, through an attorney, declined to be interviewed for this article.) Clarissa did not know it at the time, but the police department did not protect the identities of citizens who filed complaints. Instead, before interviewing officers, the department told them the name of the complainant.

One Sunday in December, Ben was at home, planning to watch the Bears play the Steelers, when Clarissa called, asking him to pick her up at her aunt's house. Returning home, as they drove into the parking lot next to the Wells, Watts and one of his officers pulled up behind them. They demanded Ben's keys, and started searching the car. Finally, Watts reached inside the driver's-side door and shouted, "I got it!" Clarissa said she saw Watts take something out of his sleeve, and she and Ben both recalled what Watts said next: "Put the cuffs on him—and you can lock her ass up, too."

Both Ben and Clarissa were charged with drug possession with intent to sell. Clarissa had never been arrested before, and set out to prove that she and Ben

had been framed. That turned out to be far more difficult than she had expected. Ben was convicted and imprisoned, while Clarissa reluctantly pleaded guilty in exchange for a probation sentence. During the next ten years, she struggled to raise their sons alone, suffered from depression, and at times was unemployed. But she kept at it, and her and Ben's efforts started a chain of events that, last fall, led the state's attorney's office to dismiss the convictions of fifteen men who had been arrested by Watts's team. The director of the office's Conviction Integrity Unit told reporters, "The police were not being truthful," and "in good conscience we could not see these convictions stand."

Joshua Tepfer, an attorney at the University of Chicago Law School's Exoneration Project, has represented Ben since 2015. He called the dismissal of the convictions "the first mass exoneration in Cook County history." As cities across the country reckon with cases of police misconduct and corruption going back years, judges have begun to throw out large groups of convictions. In 2014, Philadelphia police officers were indicted on charges that included robbing and assaulting citizens, leading prosecutors to seek the dismissal of more than a thousand convictions. After Baltimore police officers were indicted on racketeering charges last year, judges threw out about three hundred convictions; more than a thousand other cases are under review. In Chicago, Tepfer believes that Watts and his officers wrongly arrested hundreds of people. He now represents sixty-three of them, and he is hopeful that there will be at least one more round of exonerations this year. "Clarissa is the lifeblood of this movement," Tepfer said. "She started it ten years ago, and tried to report it so many ways, and tried so many times to save her family's life."

The Ida B. Wells Homes were Chicago's first housing project for African-Americans. Named after the South Side's investigative journalist and anti-lynching crusader, the project opened in 1941, promising decent, affordable housing and a path to middle-class life to families that had left the South during

the Great Migration. By the end of the first year, sixteen hundred families lived in row houses and walkups spread across nearly fifty acres, with a field house, a large park, and a community center.

In the next two decades, the Chicago Housing Authority doubled the population of the Wells, adding ten seven-story buildings, known as the Wells Extensions, and four fourteen-story buildings, called the Clarence Darrow Homes. At the same time, it put up more than twenty-five other projects, many of them high-rises in African-American neighborhoods. By 1970, some twelve thousand families were living in public housing on the South Side. In subsequent years, federal budget cuts and local mismanagement contributed to the projects' decline, making them less desirable to working-class families. More poor families moved in, many of them led by single parents.

Ben's mother raised him and two daughters in the Wells during the seventies and eighties. He met his father only a few times. When he was young, he and his friends played in tunnels beneath the buildings, which they entered by lifting grates on the street. "That was like our clubhouse," he recalled. "We used to shoot at the rats with our slingshots."

Living conditions there continued to worsen. In 1985, a bullet pierced the window of an apartment, hitting a thirteen-year-old boy in the head. Paramedics got trapped in a stalled elevator with the boy, and he later died at the hospital. A *Sun-Times* reporter who visited the Wells the following year found garbage chutes clogged with trash, hallways with broken lights, and urine-soaked stairwells.

During those years, crack use spread in the Wells, and Ben's mother became an addict. He spent his first year of high school with an aunt in Milwaukee. When he returned to Chicago, he had trouble obtaining his transcript and never reënrolled in high school. Like many other teen-agers in the projects, he said, he

had to fend for himself: "When they come looking for their mother, they find her in a smokehouse." In 1989, when Ben was seventeen, he was arrested twice on drug charges and sentenced to probation.

Clarissa grew up half a mile from the Wells, in very different circumstances. Her parents—Clarence, who worked at a detective agency run by a former police officer, and Florence, a stay-at-home mother—owned a three-story house with a winding staircase. They sent Clarissa, her sister, and her two brothers to Catholic school. Clarissa never visited the Wells. "My parents kept us from that world," she said. "The only thing I heard about was shootings, poverty—nothing good."

Clarissa, who was a shy and sheltered teen-ager, met Ben in 1990, when they enrolled in the same South Side night school. She had been attending a Catholic girls' school on the West Side but left after her junior year. There were few African-American students, and, Clarissa said, "I think we had it harder." Boys had thrown bottles at Clarissa as she waited for her mother to pick her up, and a student had used a racial epithet in her presence to describe Harold Washington, Chicago's first black mayor.

One evening at night school, Clarissa arrived late to class and sat behind Ben. Later, he invited her to join him at his table in the cafeteria, and then offered her a ride home with some of his relatives, who were also students. They headed up State Street, through a four-mile stretch of high-rise housing projects, and stopped in front of Stateway Gardens. "I was nervous," Clarissa recalled. "It was dark, and there were a lot of people outside." When they stopped at her house, she invited everyone to come in. Ben said, "Then she goes into the kitchen with her sister, and she comes back with all these glasses, with all this crushed ice and 7 UPs, offering everyone drinks."

Ben and Clarissa started dating. Ben had a playful, easygoing way about him, and, Clarissa recalled, "My mother right off liked him." Her father was more

standoffish, but, she said, "as time went on, he began to love him." She gave birth to their first son, Ben, Jr., in 1991, a month before her twentieth birthday. Gerard followed in 1992, and Deon in 1993. (Ben also had two other children.) Clarissa and the boys lived with her parents, while Ben lived at his aunt's apartment nearby.

A month before Deon was born, Ben was arrested for shooting another young man, and charged with attempted murder. He spent the next four years in prison. If Clarissa's parents were upset about the situation, they didn't show it, she said, "I guess because we had the kids." Several months before Ben was released, in 1997, Clarissa rented a three-bedroom apartment in the Wells Extensions for the family, for less than two hundred dollars a month. Her father offered to buy her a house elsewhere, but she refused. "I didn't want to depend on my dad's finances," she said.

Clarissa tried to improve the apartment—putting up wallpaper in the kitchen and sheer curtains in the living room—but it was hard to disguise the building's state of neglect. When tenants left, the housing authority at times just boarded up the empty apartments. Three years before Clarissa and her sons moved in, two boys, aged ten and eleven, had dropped a five-year-old named Eric Morse from the window of an abandoned fourteenth-floor apartment in the Darrow Homes. For many, Eric's murder confirmed that Chicago's housing projects, with their squalor, drug markets, and frequent shootings, were beyond repair. Standing near the spot where the boy had died, Henry Cisneros, President Clinton's Secretary of Housing and Urban Development, told a crowd of reporters and residents, "It's the shame of Chicago and the shame of America that people have to live like this." The next year, the housing authority began demolishing the Darrow Homes, and, shortly afterward, it developed a ten-year plan to remake the city's public housing, which included demolishing the high-rises.

Clarissa planned to leave the Wells as soon as she'd saved enough money to afford a better place. She started working as a sales associate at Filene's Basement, and Ben looked after the boys. Every evening, she came home and cooked a full dinner, like the ones her mother had made. "She was so proper, with a big old smile on her face," Ben's sister Gale Anderson said. "She'd go to work, come home, be the wife." The apartment became a gathering place for Ben's family and friends. "When I cooked, I cooked for everybody," Clarissa said. "You can be on drugs, you can be hustling, you can just pass by—everyone is welcome." She was proud of her short ribs, fried chicken, and pot roast. "I wasn't eating ramen noodles or meat in a can," she said. "I'm not saying it is wrong, but I'm not giving you something that I'm not going to eat."

After the Darrow Homes were demolished, more drug traffic gravitated to the Extensions. People involved in the drug trade stood outside the buildings, shouting the names of the drugs being sold: "Xbox!" "Knockout!" "Renegade!" Others waited inside, where they frisked buyers, to make sure they weren't undercover cops. When Clarissa's brother Bryan Glenn visited her building, he said, there were "drug addicts and drug dealers standing in the hall, screaming up to the next level that someone is coming."

Sergeant Ronald Watts—who, like nearly everyone in the Wells, was African-American—had spent part of his childhood in the Darrow Homes, and he knew how to exploit the lawlessness of the housing project. At five-eleven and two hundred and forty pounds, he was an intimidating presence. Shaun James, who lived in the Extensions, often took part in the project's dice games and carried a wad of bills in his pocket. He recalled Watts's shakedown tactics: "He used to take us in the hallway one by one. 'Man, how much money you got on you?'" James would pull out his cash and hand it to Watts, who would count it, then ask, "How much is your freedom worth to you?" Sometimes Watts would even itemize the costs of an arrest, including the bond payment. "Now, here it is, I'm

charging you three thousand dollars for your freedom. What are you going to do?" Ben recalled that one of Watts's officers once told him, "It would be cheaper to pay us instead of paying a lawyer, paying a bond." To make his point, Watts sometimes brandished a bag of drugs. James said, "You knew if you ain't paying him you was going to jail."

In 2001, the movie "Training Day," about a corrupt Los Angeles police detective named Alonzo Harris, was released, and some Wells residents started calling Watts "Alonzo." In the climactic scene, Harris, played by Denzel Washington, threatens a group of men, saying, "I'm putting cases on all you bitches!" James recalled a day when Watts found out that someone had filed a complaint against him with the Office of Professional Standards. "This man came down there snapping like he was just watching 'Training Day' and thinking about us," James said. " 'Y'all want to call O.P.S. on me? I'll put cases on all you bitches!' "

Michael Newman, who grew up in the Wells, said that the only defense against Watts was to "hope he's in a good mood and not putting any drugs on you." Newman, who is now a manager at a homeless shelter in the Chicago suburbs, went on, "Everyone was not a gangbanger. Everyone was not selling drugs. But everyone who was over there would be treated as such." As he saw it, the attitude of Watts and some of the other officers was: "Everyone is guilty over here. They live in the projects, the slums. Who cares about these people? Who is going to believe your word over mine?"

No one knows how many men Watts and his officers framed, in part because so many of them pleaded guilty. Watts's officers at times planted such large quantities of drugs on Wells residents that they were charged with a Class X felony, the highest-level felony after first-degree murder. If the defendant went to trial and lost, he faced up to thirty years in prison. Phillip Thomas, who sold candy from a cart in the Wells, recalled that when he told his public defender that Watts's officers had planted drugs on him, "she made it quite clear that she

didn't believe me and that my best bet was to plead guilty." Ignoring her advice, he represented himself at trial. He lost, and was sentenced to six years. Shaun James told his public defender a similar story, and, he said, "She's looking at me like I'm crazy. She said, 'Ain't no judge is ever going to believe that.' " James and his co-defendant, Taurus Smith, both pleaded guilty and were sentenced to two years' probation.

Clarissa and Ben decided to fight the cases against them: Ben's, from when he was arrested alone, and Ben and Clarissa's, from when they were arrested together. They assumed that, because the state's attorney's office was aware of Watts's corruption, it would eventually drop the charges against them. David Navarro, the prosecutor who met with Clarissa and Ben in the spring of 2005, told me that he believed them, and spent months investigating their claims about Watts, but he couldn't prove the allegations. "It's very difficult to prove a case when your only witness is the guy who has a pending case against him, and that guy has a criminal background," he said.

In April, 2006, a Cook County prosecutor announced in court that she was ready to go to trial in Ben's case. Around that time, Clarissa and Ben married, at City Hall. "He had been asking," Clarissa said. "I wanted him to know I was going to be there."

On May 23, 2006, Ben's trial began, in a cavernous room at the Cook County courthouse, on the city's West Side. Clarissa watched from the front row; Ben sat beside Mahoney. In Mahoney's opening statement, he said bluntly, "Sergeant Watts likes cash, and by that I mean he takes bribes." Ben took the witness stand and explained that, on the afternoon of his arrest, he had been coming down the stairs of his building when he passed two men selling drugs on a landing. A police officer appeared and ordered all three of them to put their hands on the wall.

"Did you have any narcotics on you?" Mahoney asked.

"No," Ben said.

A prosecutor called Watts and the three officers who had arrested Ben. One officer, Douglas Nichols, testified that Ben "was holding a clear plastic bag containing numerous smaller ziplock baggies containing white powder."

Another, Robert Gonzalez, seemed less certain, and the judge, MichaelP. Toomin, asked him for clarification: "You said that you didn't see anything in Mr. Baker's hand when you detained him, is that right?"

"I didn't have a view of what was in his hand until he came toward me," Gonzalez said. But, after another officer detained Ben, Gonzalez said, "I caught a glimpse of the narcotics."

"Where was it?" Toomin asked.

"In his hand, I don't recall."

When Watts took the witness stand, Mahoney said, "Have you ever asked Mr. Baker to give you any money for any reason at any time?"

"No," Watts said.

The trial took less than two days, spread over two weeks. On June 9th, Toomin declared Ben guilty. Ben's defense, he said, was "based solely on his testimony, his self-serving testimony," and was "actually contradicted by credible evidence presented by a number of police officers." Toomin later explained in court that he knew the state's attorney's office had investigated Watts, but noted that "nothing happened. It bore no fruition at all." (Toomin declined to comment on the case.)

At Ben's sentencing, Mahoney asked for "mercy"; Toomin gave Ben eighteen years. Afterward, Clarissa wrote to the judge, begging him to reconsider. She worked full time, she said, "while Ben is taking our boys to school and picking them up and helping them with their homework. Here are examples of how two African-American parents are active and involved in our kids' productive lives." Toomin reduced the sentence to fourteen years.

Ben was taken to Stateville Correctional Center, thirty miles southwest of Chicago. Three months later, on September 18, 2006, he was brought back to Toomin's courtroom, to stand trial with Clarissa on their joint case. A prosecutor offered them a last-minute deal: if they both pleaded guilty, Clarissa would receive one year of probation, and Ben would get an additional four years in prison.

*Phillip Thomas represented himself at trial, lost, and was sentenced to six years in prison.*
Photograph by Zora J. Murff for The New Yorker

Standing before the judge, they quickly conferred. Clarissa wanted to take the case to trial—"In my mind I was, like, No, we're going to fight, because I'm *innocent,*" she said—but Ben told her that they should take the plea deal. If they went to trial and were convicted, Clarissa would spend at least four years in prison. Who would take care of their boys? In tears, she pleaded guilty.

Judge Toomin told them that he thought there was insufficient evidence "that these are renegade police officers," but he assured them that if their accusations eventually proved true he would take action. "I would have no hesitation but to vacate all of the guilty findings, judgments, sentences, including the fourteen years you're doing now." At the end of the proceeding, Mahoney told the judge, "Ms. Glenn would like to hug Mr. Baker."

Clarissa was now the mother of three adolescent boys, with a full-time job and a husband in prison. Before Ben's trial, they had found a house on the South Side, and she had obtained a Section 8 voucher to help pay the rent. But, with Clarissa's felony conviction, she was no longer eligible for Section 8. She felt that in some ways her life was even more stressful than Ben's. "I'm worried about him in there, I'm worried about us out here in the world. I'm worried about bills, I'm worried about income, I'm worried about food, I'm worried about safety—so I'm twice as worried," she said. She tried to hide her feelings from their sons. But Ben, Jr., who is now twenty-six, told me, "We saw it—how much pain she was in."

"Every part of her was dying on the inside," Clarissa's brother Bryan recalled. "The person you love—that you wrapped yourself up in, that you made a huge bet on—is now in jail. You're being ridiculed—family is ostracizing you. Not necessarily us, but other extended family. Now all of your business is out in the open. For a person like her, that is huge." Clarissa told me, "I was mad and angry and had a lot of hate in me. And you're not supposed to hate anyone, but these officers changed my entire being."

In 2008, Ben was transferred to Pinckneyville Correctional Center, three hundred miles from Chicago, where he shared a cell and slept on the bottom bunk. He kept two photos of Clarissa in his Bible, and he stuck photos of his children in the mattress above him. "So when I go to sleep and wake up, they're the first thing I see," he said. Because Ben hadn't known his father, he tried, with his own sons "to be there for them as much as I could," he said. Now he missed Ben, Jr.,'s football games, and Gerard's basketball games, and the day Deon won a cooking competition. Clarissa often visited Ben, but she could afford to bring the boys only twice a year.

Meanwhile, the F.B.I., which had occasionally heard about Watts's conduct,

received new information in 2007 and undertook an investigation. A federal prosecutor named Thomas Shakeshaft began working with the Bureau to develop a case against Watts. "These cases take a long time to do, especially when you're trying to nail a Chicago cop," Shakeshaft said. The Watts case was particularly difficult, because the most likely informants were involved in the drug trade, a fact that a defense attorney could use to undermine their credibility at trial. "So you've got to have a bunch of coöperators and a bunch of deals," Shakeshaft said.

By 2008, Clarissa had concluded that the only way to bring Ben home was to help law enforcement catch Watts taking a bribe. She contacted the Office of Professional Standards, she said, and was referred to the F.B.I., where she offered to help recruit informants. Shannon Spalding, a police officer who was working on the F.B.I. investigation, recalled, "Clarissa walked in these people. My partner and I would wire them up and send them out on missions."

On several occasions, Clarissa said she saw an F.B.I. agent named Patrick Smith give marked money to an informant to pass on to Watts. Clarissa worked with Smith for about a year, she said, "and then all of a sudden it just fell to the wayside." Spalding said that she was told by the F.B.I. that Smith had not been "following protocol," and that the evidence he helped gather was "tainted." Another agent took over the investigation, but Clarissa had no further contact with the Bureau. (The F.B.I. declined to answer any questions about the investigation. Smith did not respond to requests for comment.)

At the time that Clarissa stopped hearing from Smith, around 2009, the Chicago Housing Authority was still in the midst of its effort to demolish its largest housing projects, including all the buildings at the Wells. Residents were promised rental vouchers to help them relocate, but thousands of people—many of them afflicted with severe drug addictions and mental illness—remained in the abandoned buildings. Finally, in the fall of 2011, the last of the Wells came

down. There was no plan for the squatters, who likely moved into homeless shelters, relatives' homes, or onto the streets.

A few months later, on the evening of February 13, 2012, Ben was lying on his bunk in Pinckneyville when someone shouted down the cellblock, telling him to turn on the TV. "Hey, Ben! They got Watts!"

Ben tuned in to the news and saw Watts running down the sidewalk, trying to evade television cameras. That morning, the F.B.I. had arrested him and one of his officers, Kallatt Mohammed, for stealing fifty-two hundred dollars from an F.B.I. informant posing as a drug courier. Watts and Mohammed had been charged in federal court with theft of government funds.

Ben stared at the television, taking in the news. His roommate was hollering, "You told me, man! You told me!" Ben wondered why Watts and Mohammed were the only ones arrested: "I'm, like, 'Damn. Just them two?' "

Clarissa learned about the arrests late that night when she was watching the news, and thought that she would soon be notified of Ben's release. But though the arrests were front-page news in Chicago, there does not appear to have been any reporting about the people who had been wrongly convicted, or an audit to find out how many were still in prison, or a push to reinvestigate their cases.

Clarissa wrote again to Judge Toomin, this time reminding him that he had promised to vacate their convictions if Watts were ever proved to be corrupt. "The reason I am bothering you is because I felt you are a fair judge and I trusted you," she wrote. Toomin replied that "the Code of Judicial Canons preclude me from providing you any guidance in this matter." Clarissa hired an attorney, who filed a petition to overturn Ben's conviction, citing the arrests of Watts and Mohammed. But the state's attorney's office argued against reopening the case, and the petition was dismissed.

Clarissa attended a few of Watts's court dates at the federal courthouse in downtown Chicago. If Watts and Mohammed were convicted, she thought, surely Ben would be released. In August, 2012, Mohammed pleaded guilty to theft of government funds. The following summer, Watts did, too. At Watts's sentencing, federal prosecutors made clear that his criminal behavior far exceeded the crime for which he had been convicted. They asked the judge to sentence him to three years. She gave him twenty-two months.

Ben had been in prison for more than seven years. Clarissa couldn't afford another attorney, so Ben persuaded a fellow-inmate, a jailhouse lawyer, to help him write a petition for a new trial, which Ben filed in January, 2014. A judge assigned his case to the state appellate defender's office, and a lawyer there eventually referred it to the Exoneration Project. That November, attorneys there sued the F.B.I. to get its records on Watts, but while they waited to receive them there was no movement on his case.

Clarissa was overwhelmed by her family's predicament. "Imagine your son sitting on the floor, holding a pillow, crying, saying he wants his dad," she said. "They were young men growing up. So, a lot of things I feel they probably wanted to talk about or say, they didn't say to me." One day, when Deon was walking home from high school, someone pulled a gun on him and stole his money and cell phone. Soon afterward, Clarissa called Deon's number from her office and got the usual monosyllabic answers: Did he make it home? Yeah. Did he have any homework? Yeah. Later, she discovered that she had been talking to the robber. If Ben had been home, she knew, he would have been able to tell the boys which streets were safe to walk on. "I was sheltered," she said. "I can't protect them like that."

*There is now an empty field where the Ida B. Wells Homes once stood.*

Photograph by Zora J. Murff for The New Yorker

In late 2014, Clarissa was laid off from the home-health-care agency where she had worked for a decade. She looked for a new job, but she had a felony record; no matter how well the first interview went, she was not called back. Deon dropped out of college and moved home to help. "It was a spiral going down—mentally, financially, emotionally," Clarissa said. "It was really, really tough." Some days, she didn't get out of bed. "I thought about suicide," she said. "But then I was thinking, I didn't want our boys to find me. If Ben wasn't out, who was going to be there for them?"

Clarissa could barely afford Ben's calls from prison, and when they spoke on the phone, she recounted, "He's saying, 'Don't worry.' Don't worry! Don't worry about what? Me not working? Your son getting stuck up coming home from school? It's not that I'm getting angry. But I'm *angry*. I'm angry at him. Because how can you tell me not to worry?" She said, "I had tried everything, everything, to get him out." Finally, after eight years, she gave up. That winter, she filed for divorce.

One day in September, 2015, Joshua Tepfer, of the Exoneration Project, who also worked at a civil-rights law firm, Loevy & Loevy, was handling a case for a colleague at the Cook County courthouse. It was a "nothing court date," as Tepfer put it—he simply had to appear before the judge and set the next court date for the defendant, Ben Baker. While he was in the courtroom, he started reading Ben's file. The moment he left the courthouse, he called the colleague. "Can I just make sure I understand this?" he asked. "So, he testified that he was framed, and then this cop was basically locked up for doing the same thing?" She told him that that was correct. "This is a great case," he said. "Can I work on it?"

Tepfer knew that, to get Ben's conviction thrown out, he would have to prove that Watts's corruption was far more extensive than had been shown in court. He studied the F.B.I. records on Watts, and tracked down Shannon Spalding,

the police officer who had worked on the investigation. After Watts was arrested, Spalding and her colleague Daniel Echeverria had filed a whistle-blower lawsuit against the Chicago Police Department. As Jamie Kalven reported, in a lengthy exposé in the Intercept, their supervisors labelled Spalding and Echeverria "rats" and forced them to spend weeks in an empty room at the training academy. (In 2016, the city agreed to pay them a settlement of two million dollars.)

When Tepfer first tried to enlist Spalding in his efforts to free Ben, she had reservations, in part because her lawyers had advised her not to get involved. Spalding told me, "He was pitching Ben as a reformed person. I told Josh, 'You do realize Ben Baker is a drug dealer?' " But in the end Spalding decided to help. "It doesn't matter what you do," she said. "You have to be found guilty of the crime *you* commit. He shouldn't be in prison."

On December 15, 2015, Tepfer filed a thirty-two-page petition with the court, telling the "seemingly outlandish story of police corruption" that had led to Ben Baker spending nearly a decade in prison. Two days later, the Chicago *Tribune* ran a front-page story about Ben's case, saying that it "casts a spotlight on the police code of silence." The following month, the state's attorney's office dropped the charges against Ben, and, at a brief hearing on January 14th, LeRoy K. Martin, Jr., the presiding judge of the criminal division of the Cook County circuit court, threw out his conviction. Afterward, the chief of criminal prosecutions in the state's attorney's office told a reporter, of Watts: "Now it's a fact that he's a corrupt and dirty police officer."

That evening, Ben's sister Gale picked him up at the Robinson Correctional Center, on the Indiana border, and drove straight back to their mother's house, just outside Chicago. "Everybody was there waiting," Gale said. "It was the most exciting day in the world." The next day, Clarissa heard that Ben had visited Ben, Jr., and Deon at work. She was sitting at home, still unemployed, trying to decide, "Should I call him, or shouldn't I call him?" They had not spoken in

more than a year. Before she could make up her mind, she heard a knock on the door. "Can I get a hug?" Ben said. Clarissa recalled, "When he gave me that one hug, I didn't want him to let go."

In March, 2016, a judge vacated Ben's and Clarissa's convictions from their arrest together. During the next two years, dozens of men who had lived or spent time in the Wells called Tepfer with stories about how Watts and his officers had framed them, too. Tepfer invited many of them to the Exoneration Project, in a converted loft building in Chicago's gentrified West Loop. Shaun James, the dice player, came, and so did Phillip Thomas, the candy seller at the Wells, bringing a hundred pages of legal documents that he'd kept from his case, a decade earlier. Sean Starr, an attorney who helped Tepfer interview the men, told me, "A lot of them said that, to some degree, this ruined their life."

Meanwhile, a lawyer named Kim Foxx was running an insurgent campaign for state's attorney, promising "to bring back integrity to our criminal-justice system." Foxx, who is forty-six, the same age as Clarissa, grew up in Cabrini-Green Homes, Chicago's most infamous housing project. When she was in high school, she told me, she toured the Cook County Jail with her classmates as part of a "scared straight" program. "It was horrible," she said—overcrowded, with people sleeping on mattresses on the floor. She attended college and law school at Southern Illinois University, and later worked in the state's attorney's office.

Foxx is personable, polished, and almost regal: she is nearly six feet tall, and when we met, in February, she was wearing three-inch black heels. She seemed to have little chance of defeating the incumbent, Anita Alvarez, until November, 2015, when city officials released footage of a police officer fatally shooting a teen-ager named Laquan McDonald. The shooting had occurred a year earlier, but Alvarez did not charge the officer with first-degree murder until the day the footage was released. Young activists launched an anti-Alvarez campaign, called "Bye, Anita." Foxx said, "Sometimes it takes really jarring incidents to shock the

consciousness of people about what elected officials should be doing." She trounced Alvarez in the Democratic primary and went on to win the general election. In December, 2016, Foxx was sworn in, the first African-American woman to serve as Cook County's top prosecutor.

The following September, Tepfer filed a petition with the court to vacate the convictions of Thomas, James, and thirteen other men. He included statements that the men had made following their arrests: trial transcripts in which they insisted they had been framed, motions filed by their attorneys making the same argument, complaints filed with the police department. Wrongful-conviction cases often drag on for years, but eight weeks after Tepfer filed the petition he received a call from Foxx's office. Starr heard him shout into the receiver, "Are you serious?" Starr recalled, "I could hear in his voice that something incredibly monumental had just happened."

Foxx and her prosecutors asked Judge Martin to throw out the fifteen men's convictions. The next morning, the men stood together before the judge as he did just that. One of them, a man named Leonard Gipson, who had pleaded guilty to drug charges and spent two years in jail, had three convictions overturned. He told reporters, "I'm just happy for me and my friends that someone gave us the opportunity to look at our cases and understand what Watts was really doing to us." Foxx told me, "Any time I'm asked to sign off on the vacating of a conviction, there is that moment of thinking about what it means for the individual in that case. And then there is the pit in my stomach that is always, How many more are there? How many people are sitting in a cell? How many people are sitting at home with a conviction and can't get a job based on a case that shouldn't have been there?"

On a Monday evening this past January, I visited Ben and Clarissa at their house on the South Side. They sat on a leather sofa in the living room, where a framed photo of them from around 2002 hung on the wall. After

Clarissa's felony record was erased, she had found work as a receptionist in a dentist's office. When we met, Ben had just started the first job he'd ever held, as a machinist at a packaging company. We spoke for a few hours about their life in the Wells, their arrests, and their efforts to expose Watts. An hour or so into our conversation, Ben turned to Clarissa. "Are you all right? Why are you crying?"

"Because it's just living it, and knowing what I went through," she said. "It was *not* good."

When Ben was in prison, Clarissa said, she and the boys "didn't really talk about it in the house."

"There wasn't nothing to talk about," Ben said. "I wasn't there. They didn't understand why I wasn't there. So what was there to talk about?"

So far, Foxx's office has thrown out thirty-two convictions of people who were arrested by Watts and his officers. But Watts and Mohammed were involved in about five hundred felony convictions between 2004 and 2012, and Tepfer believes that Foxx should overturn all of them, as well as the rest of the convictions tied to Watts's team. "We can't trust a single thing that happened in any of these cases," he said. Foxx is more cautious. "We want to make sure we're doing our due diligence," she said. Last fall, the Chicago police superintendent placed on desk duty a sergeant and fourteen officers who worked with Watts. All of them remain on the police force.

The expanding scope of the Watts scandal continued to amaze Clarissa. "I just wanted to get Ben out," she told me when I met with her and Ben. "I didn't know it was going to get so huge." Whenever there was a court date for the other "Watts victims," as Tepfer calls them, she showed up to watch the proceedings. For her, the court dates provided a kind of release. "When I started coming to court, it felt like a vest came off," she said. "It's like a layer being

constantly peeled off. Like you can breathe. You can breathe more and more."

This spring, on the morning of April 10th, Tepfer was on his way home from a conference at Villanova University, outside Philadelphia, called Mass Exoneration and Ethics. As his flight landed in Chicago, he looked at his phone and saw he had several messages from Clarissa. She had been driving home from the gym when she saw unfamiliar cars parked outside her house.

She kept driving, met Tepfer, and they went together to the house, where they found law-enforcement officers putting handcuffs on Gerard. A federal agent said that he also had an arrest warrant for Ben Baker. Tepfer called Ben at work and told him to come home, and they drove together to the federal courthouse downtown. Officers put Ben in shackles and took him to jail. He had been home a little more than two years.

Federal prosecutors charged Ben with four counts of "distributing a controlled substance": selling heroin and fentanyl to a D.E.A. informant. According to the criminal complaint, the four alleged sales, each worth about four or five hundred dollars, had occurred during the day at Ben and Clarissa's house, thirteen months after Ben got out of prison, before he found a job. In a separate federal criminal case filed that day, Ben's friend Jamar Lewis, who had been part of the mass exoneration, was charged with conspiracy to distribute heroin. Gerard was charged in another heroin and fentanyl case, brought by the state's attorney's office. All three have pleaded not guilty.

Two days later, Clarissa, Ben, Jr., and Deon went to the federal courthouse, with Ben's mother, three of his aunts, a cousin, a niece, and a year-old grandniece, for a bail hearing. In a carpeted hallway outside the courtroom, the family held hands and bowed their heads, as one of Ben's aunts led them in a prayer: "Lord, Ben needs you right now. Right now . . ."

They filed silently into the courtroom. Clarissa sat in the second row, wearing a white puffer vest. A door swung open, and everyone turned to watch Ben, in an orange jail uniform and leg irons, make his way to the front of the courtroom.

Ben's new lawyer, Molly Armour, told the judge that Ben was on a "forward trajectory." The president of the packaging company had sent a letter to the court, saying that Ben had been an "exemplary employee from the start," who had "never been late to work even once." He added, "I am truly hoping that he can return to work as soon as possible." But to have any chance at release Ben needed someone to agree to supervise him.

"Can I talk to the third-party custodian?" the judge, Mary M. Rowland, asked.

Clarissa walked to a wooden lectern.

"How long have you known Mr. Baker?"

"Twenty-seven years," she said.

The judge asked, "Do you understand what it means to be a third-party custodian? In some sense, you are the eyes and ears of the court." If Ben was released and broke any of the court's rules—if he stayed out past curfew, or if he smoked marijuana—she would have to report him.

The judge continued, "What are your children doing?"

Clarissa was so nervous that she forgot the name of the sandwich shop where Ben, Jr., and Deon worked. "In a restaurant downtown," she finally said. Just then, her grandniece ran to the front of the courtroom. Clarissa reached down and lifted her up. Once the judge finished with her questions, Clarissa returned to her seat, carrying the toddler.

The judge turned to Ben. "I'm very troubled that you get out in 2016 and a year

later there are allegations you've engaged in this conduct," she said. But, she added, "I'm very impressed by the letter from your employer." She continued, "You've got a great job, and you're doing a great job." As it became clear that she was planning to release Ben, Clarissa's shoulders relaxed and she exhaled. Deon, seated behind her, patted her back. It was a small victory. Ben faces up to thirty years on each count. ♦

*This article appears in the print edition of the May 28, 2018, issue, with the headline "Framed."*



*Jennifer Gonnerman joined The New Yorker as a staff writer in 2015. She is the author of "Life on the Outside: The Prison Odyssey of Elaine Bartlett." Read more »*

## Video